United States District Court
District of Massachusetts

|   |   |   |
|---|---|---|
| JANET H. FOISIE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | No. 17-40019-TSH |
| | ) | |
| WORCESTER POLYTECHNIC, INSTITUTE, | ) | |
|     Defendant. | ) | |

Memorandum of Decision and Order
September 30, 2019

HILLMAN, D.J.

Background

Janet H. Foisie ("Janet" or "Plaintiff") has filed suit against Worcester Polytechnic Institute ("WPI") alleging claims for fraudulent transfer and/or constructive fraudulent transfer in violation of Connecticut statutory and common law. This arises as the result of a transfer which Robert Foisie ("Robert")[1] made to this alma mater, WPI, after his divorce from Janet. Janet alleges that during the divorce proceedings Robert hid millions of dollars in an offshore account in Switzerland. She alleges that Robert's transfer of that hidden wealth, and much of his other assets, to WPI was done for the purpose of defrauding her. This Memorandum of Decision and

---

[1] Robert died after this suit was commenced. It should be understood throughout this opinion that where appropriate, references to Robert should be considered references to his Estate.

:

Order addresses Defendant's Motion To Dismiss (Docket No. 14). For the reasons set forth below, that motion is *granted.*

**Standard of Review**

On a Rule 12(b)(6) motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted). The standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm.*, LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotations and original alterations omitted). "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernàndez v. Fortuño-Burset,* 640 F.3d 1, 13 (1st Cir. 2011).

:

## **Facts**
### The Divorce; Robert's Financial Disclosures

In or about September 2010, after approximately fifty years of marriage, Janet and her then-husband, nonparty Robert decided to divorce. They jointly engaged a private mediator in West Hartford, Connecticut, Attorney Eliot Nerenberg, to facilitate their negotiations. Janet and Robert entered into an oral agreement (the "Mediation Agreement") to make candid and complete disclosure of their assets and financial circumstances in order to facilitate a fair settlement.

On or about September 28, 2010, during Janet and Robert's initial meeting with the mediator in his Connecticut office, Janet and Robert agreed to equally divide their assets as part of the planned dissolution of their marriage. During the meeting, Robert enumerated the assets that he owned and stated to Janet that he did not have "any offshore assets," or any assets other than those that he had enumerated in the meeting. The mediator memorialized the enumeration of assets and Robert's statement in a letter, dated September 28, 2010, addressed to Janet and Robert.

On or about October 4, 2010, as part of the mediation process, Robert sent a letter to Janet (the "October 2010 Letter"), enclosing documents purporting to reflect "our total assets within ±1%." In the letter, Robert asked Janet "to accept the enclosed summary as accurate," and he stated that "[h]idden money or offshore assets do not exist." Robert and Janet eventually reached an agreement on settlement terms, including a division of the assets that had been discussed in the mediation process. In or about January 2011, Janet commenced a marital dissolution action in the Connecticut Superior Court for the Judicial District of New London at

3

:

Norwich, docket number KNO-FA-1 I -4115278-S (the "Divorce Action"), for the purpose of obtaining a stipulated judgment of dissolution on the agreed-upon terms.

In or about January 2011, Janet and Robert entered a written Marital Settlement Agreement (the "Settlement Agreement"). The Settlement Agreement included a recital that "each of the parties hereto is fully advised as to the property, prospects, and estate of the other and is aware of their respective rights and liabilities, each against the other and to and upon the property and estate of the other." By signing the Settlement Agreement, Robert affirmatively represented as a statement of fact that this recital was true, including representing that he had fully advised Janet of all his assets.

In or about August 2011, Janet and Robert submitted the Settlement Agreement to the Connecticut Superior Court in the Divorce Action, and jointly moved for a judgment of dissolution on the agreed terms. On or about September 8, 2011, the court granted the requested stipulated judgment (the "Judgment"). Janet and Robert mutually exchanged sworn financial statements and submitted them to the Connecticut Superior Court, purporting to disclose all their respective assets, subject to perjury, in their then-current "financial affidavit" forms. (The sworn financial affidavit that Robert provided to Janet shall hereafter be referred to as the "Financial Affidavit").

The Financial Affidavit form called for the disclosure of Robert's "assets" and of his "bank accounts," without limitation or exception. By completing the form and providing it to Janet, debtor Robert impliedly represented, as a statement of fact, that all his assets and bank accounts were listed in the Financial Affidavit. Furthermore, Robert specifically

4

represented in the Financial Affidavit, as a statement of fact, that the disclosures therein were "true and accurate to the best of [his] knowledge and belief."

In agreeing to the Settlement Agreement and in moving for the entry of judgment in accordance with those terms, Janet specifically relied upon (i) Robert's statements in the September 28, 2010, meeting and the October 2010 Letter; (ii) the recital in the Settlement Agreement that Robert had fully informed her of his assets; (iii) the truth and completeness of the information that Robert disclosed to her in the Financial Affidavit; and (iv) Robert's profession of such truth and completeness. Robert's financial condition, and the amount of his assets, were material considerations in her decision whether to stipulate to a judgment of marital dissolution and on what terms. In particular, they were material considerations in whether and on what terms to stipulate to a division of the parties' assets.

Robert lied in the September 28, 2010, meeting. He lied in the October 2010 Letter, and he lied in the Settlement Agreement and his Financial Affidavit. His representations that he had no offshore assets, that he had fully advised Janet of his assets, and that all his assets were included in his Financial Affidavit, were all untrue. Furthermore, Robert knew, at the time that he made those representations, that they were untrue. Robert willfully and repeatedly failed to disclose the existence of secret offshore assets that he held, including, but not necessarily limited to, the "Vaduz Trust," consisting of securities held for his benefit in Switzerland.

In post-judgment discovery responses Robert provided in the Divorce Action, he acknowledges not having disclosed the existence of the Vaduz Trust to Janet, and gives the value of the trust at the time of the dissolution of their marriage as $4,513,729.36. Robert also failed to

:

disclose, or affirmatively misrepresented, the existence, the accurate values of, and/or his ability or intention to collect upon, various promissory notes payable to him from nonparty Michael R. Foisie ("Michael"), Robert and Janet's son, and from nonparties Michachunk Development, Inc. ("Michachunk") and Riverheights Development, Inc. ("Riverheights"), entities owned or partly owned by Michael.

At the times of Robert and Janet's September 28, 2010 meeting with Attorney Nerenberg, and of the October 2010 Letter, Robert held:

>• a March 23, 2010 promissory note from Michael for $1,000,000 (one million dollars)
>
>• a February 2, 2010 promissory note from Riverheights for $1,000,000 (one million dollars); and
>
>• a February 2, 2010 promissory note from Riverheights for $234,000 (two hundred thirty-four thousand dollars).

Robert did not disclose the existence of these notes in the September 28, 2010 meeting, or in the October 2010 Letter.

On August 2, 2011, the date that Robert signed the copy of the Settlement Agreement that was submitted to the court as part of the parties' motion for stipulated judgment, Robert still held the promissory notes referred to above. He also held the following notes:

>• an October 20, 2010 promissory note from Michachunk for $6,906,815 (six million, nine hundred six thousand, eight hundred and fifteen dollars);
>
>• a December 31, 2010 promissory note from Michael for $650,000 (six hundred fifty thousand dollars);

;

>• a January 3, 2011 promissory note from Michael for $200,000 (two hundred thousand dollars);

:

    • a January 19, 2011 promissory note from Michael for $125,000 (one hundred twenty-five thousand dollars);

    • a March 8, 2011 promissory note from Michael for $100,000 (one hundred thousand dollars);

    • an April 4, 2011 promissory note from Michael for $100,000 (one hundred thousand dollars);

    • a May 2, 2011 promissory note from Michael for $100,000 (one hundred thousand dollars); and

    • a June 13, 2011 promissory note from Michael for $80,000 (eighty thousand dollars).

Robert signed the Settlement Agreement including only a recital that "[t]here is a Note Receivable from Michael in the approximate sum of Seven Hundred Thousand Dollars ($700,000)." None of the above-referenced promissory notes corresponds to this loan, and in the Settlement Agreement and the motion for stipulated judgment, Robert did not disclose the existence of any of the other promissory notes referred above.

At the time that Robert signed the Financial Affidavit on September 8, 2011, he still held all the promissory notes referred to above. In addition, he also held an August 3, 2011 promissory note for $100,000 (one hundred thousand dollars). The only promissory note listed in the Financial Affidavit Robert signed a promissory note payable from "Michael R. Foisie" for "$700,000." None of the above-referenced promissory notes corresponds to this listing.

On or about September 8, 2011, in a hearing in the Connecticut Superior Court on a motion that the court adopt the stipulated judgment of dissolution proposed by Janet and Robert, Robert gave testimony again purporting to affirm his previous disclosures, without mentioning the secret Swiss assets or the omitted promissory notes, and purporting to confirm

7

:

that he did not intend to collect any money from Michael against the promissory notes. That testimony was false.

In or about December 2015 Robert accepted from Michael a payment of $3,000,000 (three million dollars) against the promissory notes. Robert did not then disclose, and has never disclosed, to Janet the fact that he received that payment. In representing that he had no offshore assets and in omitting the secret Swiss assets from his disclosures, Robert intended to induce Janet to conclude that he had neither offshore assets, nor assets other than those that he had disclosed, and to rely on his narrower, false disclosures.

In failing to disclose the promissory notes, and in mispresenting the amounts of the notes and his ability or intention to collect upon the notes, Robert intended to induce Janet to forego any claim to the notes, and to rely on his narrower, false disclosures. Robert's lies and omitted disclosures caused Janet to come to an incorrect conclusion about the amount of assets at issue in a dissolution of their marriage. Specifically, she relied on Robert's false statements and incomplete disclosures to her detriment in that (i) she agreed to a smaller award of marital assets than she would have agreed to had she known the truth, and (ii) she came to an incorrect conclusion about the value of the claims she would have had in a contested dissolution proceeding and that she forewent by agreeing to a stipulated judgment of dissolution.

Robert's Transfers to WPI Since the Divorce

Since the date of entry of dissolution of Janet and Robert's marriage, Robert transferred to WPI the Vaduz Trust and the money he collected from Michael against the

:

promissory notes. In post judgment discovery responses that Robert provided in the Divorce Action, he acknowledges having transferred the assets, supposedly in fulfillment of a prior pledge to WPI. In or about December 2016, Robert transferred yet more money to WPI and/or to the government of Antigua and Barbuda to fund the enrollment of an "unlimited" number of Antiguan and Barbudan undergraduate students at WPI through a scholarship administered by the Prime Minister's Scholarship Program.

Since the dissolution of his marriage to Janet, Robert has transferred at least $39 million in purported donations to WPI. Robert's transfers to WPI since the dissolution of the marriage were made for no consideration or for less than reasonably equivalent value, as were any pledges that Robert purported to be fulfilling in making such transfers. Robert's transfers to WPI since the dissolution of the marriage have rendered Robert insolvent, considering the amount of his debt to Janet.

## **Choice of Law**

The parties disagree as to the what state's law applies in this case: Plaintiff asserts that Connecticut law applies, while WPI asserts that Massachusetts law applies. For immediate purposes, choice of law is important because WPI asserts that the Massachusetts Appeals Court's ("MAC") decision in *Welford v. Nobrega*, 30 Mass.App.Ct. 92, 565 N.E.2d 1239 (1991) is dispositive of this case, and/or because under Massachusetts law, Plaintiff's common law fraudulent conveyance claims are barred.

The Court applies Massachusetts choice of law principles to determine which state's law apply.

> The Massachusetts Supreme Judicial Court has decided 'not to tie Massachusetts conflicts law to any specific choice-of-law doctrine, but seek[s] instead a

:

> functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole,' and looks to the Restatement (Second) of Conflict of Laws (1971) as an 'obvious source of guidance.'

*Fire Ins. Exch. v. Pring-Wilson*, 778 F. Supp. 2d 116, 125 (D. Mass. 2011)(internal citations and citation to quoted cases omitted). Under Massachusetts choice of law rules:

> In an action alleging fraudulent conveyance, Massachusetts courts would apply the law of the state having the most significant relationship to the parties, the conveyance, and the underlying claim. This interpretation parallels section 145 of the *Restatement (Second) of Conflict of Laws* (1971) which, in turn, incorporates the choice influencing considerations of section six.
>
> ….
>
> the principles or choice influencing factors in section six … are:
>
> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Silica Tech, L.L.C. v. J-Fiber, GmbH*, No. CIV A 06-10293-WGY, 2009 WL 2579432, at *18–19 (D. Mass. Aug. 19, 2009).

Before undertaking the choice of law analysis, "[h]owever, '[t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions.' The First Circuit has repeatedly explained that when 'the outcome is the same under the substantive law of either jurisdiction,' there is no actual conflict and a court 'need not resolve the [choice-of-law] issue.'" *State Farm Fire & Cas. Co. v. Pike*, 389 F. Supp.3d 94 (D. Mass. 2019)(citation to quoted case omitted).

:

WPI argues that since both Connecticut and Massachusetts have adopted the Uniform Fraudulent Transfer Act ("UFTA"), the law would be the same applying either state's law. I disagree. While it is true that both states have adopted the UFTA, they do not always interpret the statutes in the same way. For example, under Massachusetts' law, the UFTA preempts common law fraudulent conveyance claims. *Cavadi v. DeYeso*, 458 Mass. 615, 633, 941 N.E.2d 23, 37 (2011)(nonstatutory claim that requires proof of a fraudulent conveyance is preempted by UFTA). However, such claims are not barred under Connecticut law:

> 'A party alleging a fraudulent transfer or conveyance under the common law bears the burden of proving either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations or (2) that the conveyance was made with a fraudulent intent in which the grantee participated.... The party seeking to set aside a fraudulent conveyance need not satisfy both of these tests.... These are also elements of an action brought pursuant to ... [the UFTA].... Indeed, although [UFTA] provides a broader range of remedies than the common law ... [it] is largely an adoption and clarification of the standards of the common law of [fraudulent conveyances] ....' Accordingly, our Supreme Court has considered claims of fraudulent transfer based on the common law and claims based on UFTA together.

*Smith v. Marshview Fitness, LLC*, 191 Conn. App. 1, 9, 212 A.3d 767, 772 (2019). Therefore, while common law fraudulent conveyance claims are generally subsumed within Connecticut's UFTA, they are not barred. Since I do not find that states would necessarily apply the law in the same way, I will apply Massachusetts choice of law principles to determine whose law applies.

In this case, the alleged underlying fraudulent act (Robert's lying) took place in Connecticut during Robert and Janet's divorce proceedings and both Robert and Janet resided in Connecticut at that time. However, the alleged victim, Janet now resides in Florida and did so at the time this suit was filed. After the divorce Robert resided in various places including Nevada,

11

:

Florida and Antigua; at the time the suit was filed, he was living in Antigua. Janet is suing to repatriate an asset, money, which was transferred to a Massachusetts entity and which is presently located in Massachusetts—it is not clear from where the money was transferred, but based on the factual allegations that Robert hid money in offshore accounts, it is unlikely that it was transferred from Connecticut. At the end of the day, fraudulent conveyance law is primarily an enforcement tool that ensures a debtor's (in this case, Robert's) assets are available to satisfy his obligations to his victims. While most of the factors the Court must consider are neutral or point to jurisdictions that have little or no contact with this action, the most significant factor, *i.e.,* the basic policies underlying the particular field of law, favors Massachusetts since the assets Janet seeks are presently located here. Accordingly, I will apply Massachusetts law to Plaintiff's claims.

## Discussion

Janet alleges that at the time of the dissolution of her marriage to Robert, she had a claim upon the entirety of the any assets that he failed to disclose to her because such assets were part of the marital estate. Thus, Robert is liable to her for the value of assets he hid from her in their dissolution proceeding and the mediation that preceded it, including but not limited to the Vaduz Trust and the money he collected from Michael against the promissory note. Janet also alleges that Robert's transfers to WPI of assets that he failed to disclose to her and/or that he collected after the dissolution of their marriage (despite representing the he could not or would not do so), were made with the actual intent to hinder, delay, or defraud her and, therefore, are fraudulent conveyances under the UFTA and/or common law. She also alleges that at the time that he made the transfers, Robert knew that Janet already had a claim upon the assets and nonetheless, sought

:

to dispose of the assets for his personal preference and choosing, rather than give them to her, a legitimate creditor. Moreover, he did so in a way that would not bring the existence of the undisclosed assets to Janet's attention and prompt her to seek to collect on his obligation to her. Furthermore, Robert made the transfers without receiving reasonably equivalent value from WPI for any pledge to donate to the university, nor for any transfers he made to the government of Antigua and Barbuda or other third parties for the benefit of WPI. As a result, Robert has been rendered insolvent. Janet contends that under Connecticut law, Robert's transfers to WPI, and any pledges that Robert purported to be fulfilling in making such transfers are avoidable.

WPI seeks to dismiss Janet's Amended Complaint on the grounds that she has failed to state a claim for which relief can be granted. WPI first argues that Janet does not have standing to assert a fraudulent transfer claim against it because at best, she has a speculative claim or hypothetical claim against Robert. More specifically, WPI asserts that Janet received everything to which she was entitled under the Settlement Agreement-- after entry of the Judgement in the dissolution proceedings, the court has never modified the terms of the Settlement Agreement. WPI asserts that until Janet obtains a modified divorce decree, she cannot qualify as a creditor. Since she has not alleged in the Amended Complaint that the Judgement has been modified, she is not a creditor of Robert, her claims must be dismissed. In the alternative, WPI asserts that under applicable Massachusetts case law, Janet is not a creditor for purposes of the UFTA regardless of the status of the Judgment and therefore, she lacks standing and her claims must be dismissed. WPI also argues that the Amendment Complaint should be dismissed: for failure to plead a fraud claim with particularity; because her common-law fraudulent conveyance claims are barred by the UFTA; and because a Nevada court has issued a final judgment dismissing

various claims that Janet raised through a family foundation regarding Robert's treatment of assets at the time of the dissolution proceedings and therefore, issue preclusion bars Janet from bringing this case.

I find that Janet has pled her claims with the requisite particularity and that WPI has failed to establish that based on the Nevada judgment, she is precluded from raising her claims in this Court. Accordingly, WPI's motion to dismiss on these grounds is denied. WPI's request to dismiss Janet's common law fraud claims on the ground that the are barred under the UFTA is *granted*. *See Cavadi*, 458 Mass. at 633, 941 N.E.2d 23.[2] The remainder of this decision will focus on whether Plaintiff has the requisite standing to bring this action and, more specifically, her claims under the AFTA.

Janet has asserted claims against WPI under the UFTA, which provides in relevant part:

> (1) Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchase—
>
> (a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy the claim, or
>
> (b) Disregard the conveyance and attach or levy execution upon the property conveyed.

---

[2] As to WPI's issue preclusion argument, I find that Janet was not a party to the lawsuit and was not in privity with the plaintiff (a Nevada limited liability company ("LLC") managed by Michael and another) in that suit. WPI was also not a party and it is a stretch to say the university was in privity with Robert. Moreover, that suit involved Robert's alleged transfer of approximately $20,000,000 from the LLC to an investment account. The matter was tried to a jury and after verdict, was settled by the parties. While Janet may be a member of the LLC, contrary to WPI's assertion, based on the records from that case provided to the Court, she did not direct the litigation—Michael and another were managers of the LLC. Additionally, it is not apparent from the face of the complaint or any other part of the record before me that this action is based on the same claims or any part of them that were or could have been brought in the Nevada action.

:

> Thus, in order to have standing to invoke the rights under the statute and to set aside the conveyances, plaintiff must establish that she is a 'creditor' within the meaning of the statute. It is well settled that the statute does not create new claims—in order to benefit from the rights the statute creates, a person must qualify as a creditor.

*Hoult v. Hoult*, 862 F. Supp. 644, 646 (D. Mass. 1994).

WPI argues that under the MAC's holding in *Welford*, Janet lacks standing because she is not a "creditor" and therefore, her fraudulent conveyance claims are barred. In *Welford,* a wife who became divorced from her husband in 1975 sought modification of the divorce judgment after her ex-husband won $1,690,500 in the lottery in 1986. The MAC found that:

> assuming that [the wife], as a result of [the lottery] windfall, was entitled to a modification of the outstanding alimony and support orders, it is a far different matter to conclude that [she] in 1986, was a 'creditor' of her [ex-husband] for purposes of the uniform fraudulent conveyance law. The term 'creditor' is defined [to be]: a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent. A wife, where divorce proceedings are imminent, may qualify as a creditor under c. 109A and may complain of conveyances designed to frustrate the right to alimony or assignment of property. No case, to our knowledge, has held that a divorced spouse seeking modification of outstanding orders long after the divorce became final is a creditor entitled to challenge prior transfers of property. We decline to do so here. [former wife] status … does carry with it significant rights in her favor, but her continuing right to modification of support orders upon a material change in circumstances does not make her [a] creditor [of her ex-husband's] for [her] lifetime. There must be special of circumstances unrelated to the prior marriage to warrant that result. Given the fact that [she] retains and has exercised her statutory right to modification and that her claim arises only out of their previous marital relationship, we find no special circumstances that would make [her] a creditor of [her] ex-husband for c. 109A purposes.

*Welford v. Nobrega,* 30 Mass. App. Ct. 92, 100–01, 565 N.E.2d 1239, 1243–44 (1991). WPI asserts that based on this ruling, Janet cannot be a "creditor" of Robert's for purposes of the UFTA because her fraudulent conveyance claims arise out of her prior martial relationship in that she is seeking to re-open and modify the Judgment based on her allegations the Judgment was entered

15

:

based on Robert's fraud and deceit. Janet argues that this case is distinguishable from *Welford*, because she is alleging that the Judgement was obtained through fraud. More specifically, Janet argues that she had a claim to Robert's hidden assets at the time of the Judgment because those assets were part of the marital estate; those hidden assets have now allegedly been transferred to WPI. In *Welford*, on the other hand, the wife was claiming that her ex-husband had fraudulently transferred his interest in assets that he acquired years after the divorce judgment became final— that is, the wife had no claim to the assets at the time of the divorce. I agree with Janet that the circumstances of this case are distinguishable from *Welford*.

Janet cites cases in which the court set aside as fraudulent conveyances assets which a spouse had transferred to deprive the other spouse of rights in the marital estate. However, these cases involved transfers undone by the probate court prior to the entry of the divorce judgment and, therefore, are also distinguishable from this case. *See Aronson v. Aronson*, 25 Mass. App. Ct. 164. 516 N.E.2d. 184 (1987); *McDonough v. McDonough*, 55 Mass.App.Ct. 1103 (2002)( it is established that "[a] spouse in circumstances where divorce proceedings are 'imminent' may qualify as a creditor under c. 109A and may 'complain of conveyances designed to frustrate the right to alimony or assignment of property"); *accord Bak v. Bak,* 24 Mass. App.Ct. 164, 511 N.E.2d 625 (1987).

I have not found and neither party has cited to a case where a spouse has been held to be a "creditor" for purposes of the UFTA where the debtor spouse is alleged to have transferred assets post-divorce judgment which s/he hid from the martial estate. While the issue is not free from doubt, based on the MAC's explicit finding in *Wolford*, and Massachusetts courts' analysis in cases which have held that a spouse qualifies as a creditor where such transfers occur *while divorce*

:

*proceedings are imminent,* I find that Janet is not a creditor under the UFTA and therefore, lacks standing to bring this action.   Therefore, the motion to dismiss is granted.

## **Conclusion**

Defendant's Motion To Dismiss (Docket No. 14) is **_granted_**.


*/s/* **_Timothy S. Hillman_**
TIMOTHY S. HILLMAN
DISTRICT JUDGE